**NORTHEAST HARBOR
GOLF CLUB, INC.**

v.

**Nancy HARRIS et al.**

Supreme Judicial Court of Maine.

Argued April 12, 1995.

Decided July 20, 1995.

Bernard J. Kubetz (orally), Thad B. Zmistowski, Eaton, Peabody, Bradford & Veague, Bangor, for plaintiff.

William R. Black (orally), Jonathan T. Harris, Black, Lambert, Coffin & Rudman, Portland, for defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, DANA, and LIPEZ, JJ.

ROBERTS, Justice.

Northeast Harbor Golf Club, Inc., appeals from a judgment entered in the Superior Court (Hancock County, *Atwood, J.*) following a nonjury trial. The Club maintains that the trial court erred in finding that Nancy Harris did not breach her fiduciary duty as president of the Club by purchasing and developing property abutting the golf course. Because we today adopt principles different from those applied by the trial court in determining that Harris's activities did not constitute a breach of the corporate opportunity doctrine, we vacate the judgment.

## I.

### The Facts

Nancy Harris was the president of the Northeast Harbor Golf Club, a Maine corporation, from 1971 until she was asked to resign in 1990. The Club also had a board of directors that was responsible for making or approving significant policy decisions. The Club's only major asset was a golf course in

Mount Desert. During Harris's tenure as president, the board occasionally discussed the possibility of developing some of the Club's real estate in order to raise money. Although Harris was generally in favor of tasteful development, the board always "shied away" from that type of activity.

In 1979, Robert Suminsby informed Harris that he was the listing broker for the Gilpin property, which comprised three noncontiguous parcels located among the fairways of the golf course. The property included an unused right-of-way on which the Club's parking lot and clubhouse were located. It was also encumbered by an easement in favor of the Club allowing foot traffic from the green of one hole to the next tee. Suminsby testified that he contacted Harris because she was the president of the Club and he believed that the Club would be interested in buying the property in order to prevent development.

Harris immediately agreed to purchase the Gilpin property in her own name for the asking price of $45,000. She did not disclose her plans to purchase the property to the Club's board prior to the purchase. She informed the board at its annual August meeting that she had purchased the property, that she intended to hold it in her own name, and that the Club would be "protected." The board took no action in response to the Harris purchase. She testified that at the time of the purchase she had no plans to develop the property and that no such plans took shape until 1988.

In 1984, while playing golf with the postmaster of Northeast Harbor, Harris learned that a parcel of land owned by the heirs of the Smallidge family might be available for purchase. The Smallidge parcel was surrounded on three sides by the golf course and on the fourth side by a house lot. It had no access to the road. With the ultimate goal of acquiring the property, Harris instructed her lawyer to locate the Smallidge heirs. Harris testified that she told a number of individual board members about her attempt to acquire the Smallidge parcel. At a board meeting in August 1985, Harris formally disclosed to the board that she had purchased the Smallidge property.[1] The minutes of that meeting show that she told the board she had no present plans to develop the Smallidge parcel. Harris testified that at the time of the purchase of the Smallidge property she nonetheless thought it might be nice to have some houses there. Again, the board took no formal action as a result of Harris's purchase. Harris acquired the Smallidge property from ten heirs, paying a total of $60,000. In 1990, Harris paid $275,000 for the lot and building separating the Smallidge parcel from the road in order to gain access to the otherwise landlocked parcel.

The trial court expressly found that the Club would have been unable to purchase either the Gilpin or Smallidge properties for itself, relying on testimony that the Club continually experienced financial difficulties, operated annually at a deficit, and depended on contributions from the directors to pay its bills. On the other hand, there was evidence that the Club had occasionally engaged in successful fund-raising, including a two-year period shortly after the Gilpin purchase during which the Club raised $115,000. The Club had $90,000 in a capital investment fund at the time of the Smallidge purchase.

In 1987 or 1988, Harris divided the real estate into 41 small lots, 14 on the Smallidge property and 27 on the Gilpin property. Apparently as part of her estate plan, Harris conveyed noncontiguous lots among the 41 to her children and retained others for herself. In 1991, Harris and her children exchanged deeds to reassemble the small lots into larger parcels. At the time the Club filed this suit, the property was divided into 11 lots, some owned by Harris and others by her children who are also defendants in this case. Harris estimated the value of all the real estate at the time of the trial to be $1,550,000.

In 1988, Harris, who was still president of the Club, and her children began the process of obtaining approval for a five-lot subdivision known as Bushwood on the lower Gilpin property. Even when the board learned of

---

1. In fact, it appears that Harris did not take title to the property until October 26, 1985. She had only signed a purchase and sale agreement at the time of the August board meeting.

the proposed subdivision, a majority failed to take any action. A group of directors formed a separate organization in order to oppose the subdivision on the basis that it violated the local zoning ordinance. After Harris's resignation as president, the Club also sought unsuccessfully to challenge the subdivision. *See Northeast Harbor Golf Club, Inc. v. Town of Mount Desert*, 618 A.2d 225 (Me.1992). Plans of Harris and her family for development of the other parcels are unclear, but the local zoning ordinance would permit construction of up to 11 houses on the land as currently divided.

After Harris's plans to develop Bushwood became apparent, the board grew increasingly divided concerning the propriety of development near the golf course. At least two directors, Henri Agnese and Nick Ludington, testified that they trusted Harris to act in the best interests of the Club and that they had no problem with the development plans for Bushwood. *Other directors disagreed.*

In particular, John Schafer, a Washington, D.C., lawyer and long-time member of the board, took issue with Harris's conduct. He testified that he had relied on Harris's representations at the time she acquired the properties that she would not develop them. According to Schafer, matters came to a head in August 1990 when a number of directors concluded that Harris's development plans irreconcilably conflicted with the Club's interests. As a result, Schafer and two other directors asked Harris to resign as president. In April 1991, after a substantial change in the board's membership, the board authorized the instant lawsuit against Harris for the breach of her fiduciary duty to act in the best interests of the corporation. The board simultaneously resolved that the proposed housing development was contrary to the best interests of the corporation.

The Club filed a complaint against Harris, her sons John and Shepard, and her daughter-in-law Melissa Harris. As amended, the complaint alleged that during her term as president Harris breached her fiduciary duty by purchasing the lots without providing notice and an opportunity for the Club to purchase the property and by subdividing the lots for future development. The Club sought an injunction to prevent development and also sought to impose a constructive trust on the property in question for the benefit of the Club.

The trial court found that Harris had not usurped a corporate opportunity because the acquisition of real estate was not in the Club's line of business. Moreover, it found that the corporation lacked the financial ability to purchase the real estate at issue. Finally, the court placed great emphasis on Harris's good faith. It noted her long and dedicated history of service to the Club, her personal oversight of the Club's growth, and her frequent financial contributions to the Club. The court found that her development activities were "generally ... compatible with the corporation's business." This appeal followed.

## II.

### The Corporate Opportunity Doctrine

Corporate officers and directors bear a duty of loyalty to the corporations they serve. As Justice Cardozo explained the fiduciary duty in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928):

A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate.

Maine has embraced this "unbending and inveterate" tradition. Corporate fiduciaries in Maine must discharge their duties in good faith with a view toward furthering the interests of the corporation. They must disclose and not withhold relevant information concerning any potential conflict of interest with the corporation, and they must refrain from using their position, influence, or knowledge of the affairs of the corporation to gain personal advantage. *See Rosenthal v. Rosenthal*, 543 A.2d 348, 352 (Me.1988); 13–A M.R.S.A. § 716 (Supp.1994).

Despite the general acceptance of the proposition that corporate fiduciaries owe a duty of loyalty to their corporations, there has been much confusion about the specific extent of that duty when, as here, it is con-

tended that a fiduciary takes for herself a corporate opportunity. *See, e.g.,* Victor Brudney & Robert C. Clark, *A New Look at Corporate Opportunities,* 94 HARV.L.REV. 998, 998 (1981) ("Not only are the common formulations vague, but the courts have articulated no theory that would serve as a blueprint for constructing meaningful rules."). This case requires us for the first time to define the scope of the corporate opportunity doctrine in Maine.

Various courts have embraced different versions of the corporate opportunity doctrine. The test applied by the trial court and embraced by Harris is generally known as the "line of business" test. The seminal case applying the line of business test is *Guth v. Loft, Inc.,* 5 A.2d 503 (Del.1939). In *Guth,* the Delaware Supreme Court adopted an intensely factual test stated in general terms as follows:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Id.* at 511. The "real issue" under this test is whether the opportunity "was so closely associated with the existing business activities . . . as to bring the transaction within that class of cases where the acquisition of the property would throw the corporate officer purchasing it into competition with his company." *Id.* at 513. The Delaware court described that inquiry as "a factual question to be decided by reasonable inferences from objective facts." *Id.*

The line of business test suffers from some significant weaknesses. First, the question whether a particular activity is within a corporation's line of business is conceptually difficult to answer. The facts of the instant case demonstrate that difficulty. The Club is in the business of running a golf course. It is not in the business of developing real estate. In the traditional sense, therefore, the trial court correctly observed that the opportunity in this case was not a corporate opportunity within the meaning of the *Guth* test. Nevertheless, the record would support a finding that the Club had made the policy judgment that development of surrounding real estate was detrimental to the best interests of the Club. The acquisition of land adjacent to the golf course for the purpose of preventing future development would have enhanced the ability of the Club to implement that policy. The record also shows that the Club had occasionally considered reversing that policy and expanding its operations to include the development of surrounding real estate. Harris's activities effectively foreclosed the Club from pursuing that option with respect to prime locations adjacent to the golf course.

Second, the *Guth* test includes as an element the financial ability of the corporation to take advantage of the opportunity. The court in this case relied on the Club's supposed financial incapacity as a basis for excusing Harris's conduct. Often, the injection of financial ability into the equation will unduly favor the inside director or executive who has command of the facts relating to the finances of the corporation. Reliance on financial ability will also act as a disincentive to corporate executives to solve corporate financing and other problems. In addition, the Club could have prevented development without spending $275,000 to acquire the property Harris needed to obtain access to the road.

The Massachusetts Supreme Judicial Court adopted a different test in *Durfee v. Durfee & Canning, Inc.,* 323 Mass. 187, 80 N.E.2d 522 (1948). The *Durfee* test has since come to be known as the "fairness test." According to *Durfee,* the

> true basis of governing doctrine rests on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, taking advantage of an opportunity [for her personal profit] when the interest of the corporation justly call[s] for protection. This calls for application of ethical standards of what is fair

and equitable ... in particular sets of facts.

*Id.* at 529 (quoting *Ballantine on Corporations* 204–05 (rev. ed. 1946)). As with the *Guth* test, the *Durfee* test calls for a broad-ranging, intensely factual inquiry. The *Durfee* test suffers even more than the *Guth* test from a lack of principled content. It provides little or no practical guidance to the corporate officer or director seeking to measure her obligations.

The Minnesota Supreme Court elected "to combine the 'line of business' test with the 'fairness' test." *Miller v. Miller*, 301 Minn. 207, 222 N.W.2d 71, 81 (1974). It engaged in a two-step analysis, first determining whether a particular opportunity was within the corporation's line of business, then scrutinizing "the equitable considerations existing prior to, at the time of, and following the officer's acquisition." *Id.* The *Miller* court hoped by adopting this approach "to ameliorate the often-expressed criticism that the [corporate opportunity] doctrine is vague and subjects today's corporate management to the danger of unpredictable liability." *Id.* In fact, the test adopted in *Miller* merely piles the uncertainty and vagueness of the fairness test on top of the weaknesses in the line of business test.

Despite the weaknesses of each of these approaches to the corporate opportunity doctrine, they nonetheless rest on a single fundamental policy. At bottom, the corporate opportunity doctrine recognizes that a corporate fiduciary should not serve both corporate and personal interests at the same time. As we observed in *Camden Land Co. v. Lewis*, 101 Me. 78, 97, 63 A. 523, 531 (1905), corporate fiduciaries "owe their whole duty to the corporation, and they are not to be permitted to act when duty conflicts with interest. They cannot serve themselves and the corporation at the same time." The various formulations of the test are merely attempts to moderate the potentially harsh consequences of strict adherence to that policy. It is important to preserve some ability for corporate fiduciaries to pursue personal business interests that present no real threat to their duty of loyalty.

## III.

### The American Law Institute Approach

■ In an attempt to protect the duty of loyalty while at the same time providing long-needed clarity and guidance for corporate decisionmakers, the American Law Institute has offered the most recently developed version of the corporate opportunity doctrine. PRINCIPLES OF CORPORATE GOVERNANCE § 5.05 (May 13, 1992), provides as follows:

§ 505  **Taking of Corporate Opportunities by Directors or Senior Executives**

(a) *General Rule.* A director [§ 1.13] or senior executive [§ 1.33] may not take advantage of a corporate opportunity unless:

(1) The director or senior executive first offers the corporate opportunity to the corporation and makes disclosure concerning the conflict of interest [§ 1.14(a)] and the corporate opportunity [§ 1.14(b)];

(2) The corporate opportunity is rejected by the corporation; and

(3) Either:

(A) The rejection of the opportunity is fair to the corporation;

(B) The opportunity is rejected in advance, following such disclosure, by disinterested directors [§ 1.15], or, in the case of a senior executive who is not a director, by a disinterested superior, in a manner that satisfies the standards of the business judgment rule [§ 4.01(c)]; or

(C) The rejection is authorized in advance or ratified, following such disclosure, by disinterested shareholders [§ 1.16], and the rejection is not equivalent to a waste of corporate assets [§ 1.42].

(b) *Definition of a Corporate Opportunity.* For purposes of this Section, a corporate opportunity means:

(1) Any opportunity to engage in a business activity of which a director or senior executive becomes aware, either:

(A) In connection with the performance of functions as a director or senior executive, or under circumstances

that should reasonably lead the director or senior executive to believe that the person offering the opportunity expects it to be offered to the corporation; or

(B) Through the use of corporate information or property, if the resulting opportunity is one that the director or senior executive should reasonably be expected to believe would be of interest to the corporation; or

(2) Any opportunity to engage in a business activity of which a senior executive becomes aware and knows is closely related to a business in which the corporation is engaged or expects to engage.

(c) *Burden of Proof.* A party who challenges the taking of a corporate opportunity has the burden of proof, except that if such party establishes that the requirements of Subsection (a)(3)(B) or (C) are not met, the director or the senior executive has the burden of proving that the rejection and the taking of the opportunity were fair to the corporation.

(d) *Ratification of Defective Disclosure.* A good faith but defective disclosure of the facts concerning the corporate opportunity may be cured if at any time (but no later than a reasonable time after suit is filed challenging the taking of the corporate opportunity) the original rejection of the corporate opportunity is ratified, following the required disclosure, by the board, the shareholders, or the corporate decisionmaker who initially approved the rejection of the corporate opportunity, or such decisionmaker's successor.

(e) *Special Rule Concerning Delayed Offering of Corporate Opportunities.* Relief based solely on failure to first offer an opportunity to the corporation under Subsection (a)(1) is not available if: (1) such failure resulted from a good faith belief that the business activity did not constitute a corporate opportunity, and (2) not later than a reasonable time after suit is filed challenging the taking of the corporate opportunity, the corporate opportunity is to the extent possible offered to the corporation and rejected in a manner that satisfies the standards of Subsection (a).

The central feature of the ALI test is the strict requirement of full disclosure prior to taking advantage of any corporate opportunity. *Id.,* § 5.05(a)(1). "If the opportunity is not offered to the corporation, the director or senior executive will not have satisfied § 5.05(a)." *Id.,* cmt. to § 5.05(a). The corporation must then formally reject the opportunity. *Id.,* § 505(a)(2). The ALI test is discussed at length and ultimately applied by the Oregon Supreme Court in *Klinicki v. Lundgren,* 298 Or. 662, 695 P.2d 906 (1985). As *Klinicki* describes the test, "full disclosure to the appropriate corporate body is ... an absolute condition precedent to the validity of any forthcoming rejection as well as to the availability to the director or principal senior executive of the defense of fairness." *Id.* at 920. A "good faith but defective disclosure" by the corporate officer may be ratified after the fact only by an affirmative vote of the disinterested directors or shareholders. PRINCIPLES OF CORPORATE GOVERNANCE § 5.05(d).

The ALI test defines "corporate opportunity" broadly. It includes opportunities "closely related to a business in which the corporation is engaged." *Id.,* § 5.05(b). It also encompasses any opportunities that accrue to the fiduciary as a result of her position within the corporation. *Id.* This concept is most clearly illustrated by the testimony of Suminsby, the listing broker for the Gilpin property, which, if believed by the factfinder, would support a finding that the Gilpin property was offered to Harris specifically in her capacity as president of the Club. If the factfinder reached that conclusion, then at least the opportunity to acquire the Gilpin property would be a corporate opportunity. The state of the record concerning the Smallidge purchase precludes us from intimating any opinion whether that too would be a corporate opportunity.

Under the ALI standard, once the Club shows that the opportunity is a corporate opportunity, it must show either that Harris did not offer the opportunity to the Club or that the Club did not reject it properly. If the Club shows that the board did not reject the opportunity by a vote of the disinterested directors after full disclosure, then Harris may defend her actions on the basis that the

taking of the opportunity was fair to the corporation. *Id.*, § 5.05(c). If Harris failed to offer the opportunity at all, however, then she may not defend on the basis that the failure to offer the opportunity was fair. *Id.*, cmt. to § 5.05(c).

The *Klinicki* court viewed the ALI test as an opportunity to bring some clarity to a murky area of the law. *Klinicki*, 695 P.2d at 915. We agree, and today we follow the ALI test. The disclosure-oriented approach provides a clear procedure whereby a corporate officer may insulate herself through prompt and complete disclosure from the possibility of a legal challenge. The requirement of disclosure recognizes the paramount importance of the corporate fiduciary's duty of loyalty. At the same time it protects the fiduciary's ability pursuant to the proper procedure to pursue her own business ventures free from the possibility of a lawsuit.

The importance of disclosure is familiar to the law of corporations in Maine. Pursuant to 13–A M.R.S.A. § 717 (1981), a corporate officer or director may enter into a transaction with the corporation in which she has a personal or adverse interest only if she discloses her interest in the transaction and secures ratification by a majority of the disinterested directors or shareholders.[2] Section 717 is part of the Model Business Corporations Act, adopted in Maine in 1971. P.L. 1971, ch. 439, § 1. Like the ALI rule, section 717 was designed to "eliminate the inequities and uncertainties caused by the existing rules." MODEL BUSINESS CORP. ACT § 41, ¶ 2, at 844 (1971).

## IV.

### Conclusion

■ The question remains how our adoption of the rule affects the result in the instant case. The trial court made a number of factual findings based on an extensive record.[3] The court made those findings, however, in the light of legal principles that are different from the principles that we today announce. Similarly, the parties did not have the opportunity to develop the record in this case with knowledge of the applicable legal standard. In these circumstances, fairness requires that we remand the case for further proceedings. Those further proceedings may include, at the trial court's discretion, the taking of further evidence.

The entry is:

Judgment vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

**2.** Unlike the ALI rule, 13–A M.R.S.A. § 717(1)(C) permits the director to defend on the ground of fairness even in the absence of disclosure. We are not troubled by this difference because the nature of the transactions covered by section 717 is such that the board will necessarily be aware of the transaction. It may therefore act to protect the interests of the corporation even if it is not aware of the interest of the fiduciary. In the case of a usurpation of a corporate opportunity, the corporation is defenseless unless the director discloses.

**3.** Harris raised the defense of laches and the statute of limitations but the court made no findings on those issues. We do not intimate what result the application of either doctrine would produce in this case. Similarly, it was not necessary for the court to address the issue of remedy in the first trial. The court has broad discretion to fashion an equitable remedy based on the facts and circumstances of the case. We decline to invade its province by commenting prematurely on what remedy, if any, may be appropriate.