[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed September 30, 1996
On December 13, 1990, the plaintiffs, James P. Ostrowski and Theodore P. Ostrowski, filed a complaint against the defendants Craig Avery, Michael P. Passaro and Antoinette Avery. The plaintiffs have purportedly brought their complaint both in their individual capacities and derivatively, as shareholders, on behalf of Avery Abrasives, Inc. (Avery Abrasives). The plaintiffs allege in the first count of their complaint that the defendants breached their fiduciary duties of loyalty to Avery Abrasives, Inc. by forming and operating a competing business enterprise. International Small Wheels, Inc. (ISW), thereby usurping a corporate opportunity. In the second count of their complaint, the plaintiffs allege that the defendants. by their conduct, violated General Statutes § 42- 110a, et seq., the Connecticut Unfair Trade Practices Act (CUTPA). In the third count of their complaint, the plaintiffs allege that the salaries and benefits received by the defendants from Avery Abrasives, Inc., during the time the defendants operated ISW constituted unjust enrichment. In the fourth count of their complaint, the plaintiffs argue that Craig Avery breached his fiduciary duty to Avery Abrasives by allowing an Avery Abrasives employee, Mary Sobek, to engage in a competing business enterprise, Monroe Abrasives, Inc. (Monroe Abrasives) and to conduct Monroe Abrasives' business while at work at Avery Abrasives. In the fifth count of their complaint, the plaintiffs allege that "the aforementioned conduct by Craig Avery constitutes negligence and was in breach of the duty that he owed to Avery Abrasives, Inc. and its shareholders . . ." In the sixth count of their complaint, the plaintiffs allege that the 1989 conveyance to Craig Avery's wife, Antoinette, of Craig Avery's interest in the couple's jointly owned residence was fraudulent pursuant to General Statutes § 52-552 the Uniform Fraudulent Transfer Act.
The plaintiffs seek money damages, attorneys fees, punitive CT Page 5477 damages, costs, interest, an order directing the defendants to disgorge all salary and benefits received from Avery Abrasives while they were affiliated with ISW, an injunction enjoining Craig Avery from serving as an officer or director of Avery Abrasives. and an order declaring null and void Craig Avery's conveyance of his interest in his home to his wife.
A motion to dismiss the entire complaint is pending before the court. In addition, the court has conducted a trial on the merits of the entire matter so that, in the event that the motion to dismiss is denied, in whole or in part, the court need not rehear the evidence.[1]
After considering the evidence adduced at trial and in connection with the motion to dismiss, the court finds the following facts. Avery Abrasives is a Connecticut corporation in the business of manufacturing and selling abrasive cutting wheels. Raymond Avery is, and has been at all times relevant to this proceeding, the president and chief executive officer of Avery Abrasives. Raymond Avery owns over 54 percent of the outstanding stock of Avery Abrasives. The remainder of the stock is split among the company's ESOP plan and eight other minority shareholders including the plaintiffs, James Ostrowski, who owns approximately 1.44 percent of the outstanding shares, and Theodore Ostrowski, who owns approximately 2.17 percent of the outstanding shares.
During all times relevant to this proceeding, Craig Avery, Raymond Avery's son, was and is the vice president of manufacturing for Avery Abrasives. He became a director of Avery Abrasives in 1976. During all times relevant to this proceeding, Michael Passaro was and is the finishing supervisor at Avery Abrasives. Passaro, who reports to Craig Avery, supervises both manufacturing and shipping functions at Avery Abrasives.
Avery Abrasives manufactures abrasive cutting wheels used to cut very hard materials such as titanium. Avery Abrasives manufactures cutting wheels in diameters of 5 inches and greater using a resinoid process that involves the molding of a predetermined mixture of resins and abrasive materials into round disks of varying diameters and thicknesses.[2] The disks typically have a hole in the center which may also vary in shape and size. The mixture of abrasive materials and resins depends upon the ultimate application of the wheels. Although Avery Abrasives only manufactures resinoid wheels of 5 inches and CT Page 5478 greater, some of its customers require smaller wheels for certain applications. In the past, Avery Abrasives had manufactured smaller wheels, in diameters of less than 5 inches, using a specialized drill bit called a cookie cutter. The cookie cutter enabled Avery Abrasives to cut several small wheels out of a larger wheel Avery Abrasives discontinued the use of the cookie cutter method of production in or prior to 1970. At that time, Raymond Avery decided that the manufacture of wheels of less than 5 inches (small diameter wheels), was not profitable for Avery Abrasives, and that Avery Abrasives would focus its efforts on the manufacture and sale of larger, more profitable wheels, especially wheels 20 inches in diameter and larger.
During 1976, Craig Avery and Michael Passaro determined that the abrasive cutting wheel industry needed another manufacturer of small diameter wheels. Craig Avery spoke to Raymond Avery about the possibility of Craig Avery and Passaro retaining their positions at Avery Abrasives and also going into business for themselves manufacturing cutting wheels with diameters of less than four inches. Raymond Avery indicated to Craig Avery that he had no objection to Craig's plans. Neither Craig Avery nor Raymond Avery brought to the attention of the board of directors or the minority shareholders of Avery Abrasives Craig Avery's and Passaro's plans to engage in the manufacture of small diameter wheels.
On or about January 7, 1977, Craig Avery and Passaro incorporated ISW. ISW, over the course of its existence, operated out of facilities in Milford and, later, in Trumbull. ISW purchased large cutting wheels from Avery Abrasives at a discount, and used the cookie cutter method to produce smaller wheels ranging in diameter from one inch to four inches. ISW never produced wheels with diameters of greater than four inches.
After ISW manufactured the small diameter wheels, it sold them directly to its customers or sold them back to Avery Abrasives who then sold the wheels to its customers. ISW shared some of Avery Abrasives' customers, and employed some of Avery Abrasives' employees. ISW advertised in the yellow pages and produced sales material listing Avery Abrasives' telephone number as its own. In addition, Craig Avery and Passaro occasionally engaged in ISW related business while at work at Avery Abrasives. For example, Craig Avery received telephone calls regarding small diameter cutting wheels while at work at Avery Abrasives. However, Passaro's and Craig Avery's job performance at Avery CT Page 5479 Abrasives was unaffected by their conducting of ISW business at Avery Abrasives.[3]
ISW operated from 1976 to late 1989 or early 1990. During the fiscal years of 1976 through 1988, ISW generated $328,562 in gross revenue. The average annual gross revenue during that time was $25,274. Both Craig Avery and Passaro benefited from ISW's payment of personal expenses such as country club membership dues, the purchase of tires, and an appliance for Passaro's personal use and for Passaro's nonbusiness related vacations. In addition, Craig Avery and Passaro received money from the corporation in the form of loans" totaling approximately $40,000.[4] Craig Avery and Passaro, however were not paid a salary or wages for the work they performed for ISW on evenings and weekends during ISWs operation.
The essence of the plaintiffs' complaint is that by forming and operating ISW, Craig Avery and Passaro usurped a corporate opportunity belonging to Avery Abrasives.
 In a leading case on the corporate opportunity doctrine, the Supreme Court of Delaware stated the rule as follows: `[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is . . . in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and by embracing the opportunity, the self-interest or the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the properly, interests and profits so acquired.' Guth v. Loft, Inc., 23 Del. Ch. 255, 272, 5 A.2d 503. Katz Corporation v. T.H. Canty Co., 168 Conn. 201, 108-09, 362 A.2d 975 (1975).
The plaintiffs have instituted this action derivatively, in part, so that Avery Abrasives might recover from Craig Avery and Passaro the "property, interests and profits" acquired as a result of the operation of ISW.[5]
CT Page 5480
A. Avery Abrasives' Motion to Dismiss
When Avery Abrasives determined that it was being sued derivatively, the board of directors appointed a special litigation committee (the committee). purportedly to evaluate the prospect of pursuing the suit in Avery Abrasives' own name. The committee consisted of two directors of Avery Abrasives. Robert Berta, a partner with the law firm of Marsh. Day Calhoun of Whom Avery Abrasives had been a longstanding client, and Wardley Smith, the treasurer of Avery Abrasives. The committee, in turn, hired Judge John Chiota, a Judge of Probate, to act as independent counsel to the committee. Judge Chiota was charged with investigating the plaintiffs' derivative claims and filing a report as to the merits of those claims with the committee.
Avery Abrasives has moved to dismiss the plaintiffs' complaint on the ground that maintaining the suit is not in the best interests of Avery Abrasives. It claims that the committee's determination that the costs to the corporation of pursuing the claims made by the plaintiffs would be greater than any potential benefit the corporation might receive if it prevailed in recovering upon the claims, requires a dismissal of counts one, three, four, and five of the plaintiffs' complaint.
In support of its motion, Avery Abrasives cites several standards of review applicable to cases in which special litigation committees have determined that shareholder derivative suits are not meritorious. The standards of review differ as to the degree of deference a court should afford to a special litigation committee's conclusions.[6] The approaches cited by Avery Abrasives all require that the committee, upon whose recommendation the court is asked to base its dismissal, make a reasonable, good faith inquiry into the merits of the claims alleged by the shareholder(s). See Joy v. North, supra, 888:Zapata v. Maldonado, 430 A.2d 779, 787 (Del. 1981); Auerback v.Bennett, supra, 393 N.E.2d 1000-01.
The plaintiffs argue, in opposition to Avery Abrasives' motion, that the recommendation of the special litigation committee does not warrant dismissal of this case because (1) the committee was not comprised of independent directors, (2) Judge Chiota was not appropriate independent counsel because he was biased and inexperienced in corporate derivative actions, (3) the investigation performed by Judge Chiota was not thorough, and (4) CT Page 5481 the committee did not act in good faith.
Upon consideration of the evidence, including the testimony of Judge Chiota, the court is convinced that Judge Chiota's investigation was not so thorough as to allow the committee to rely substantially upon the report in making its recommendation to oppose the suit. For example, Judge Chiota found that "[w]ith respect to the specific charge that Craig Avery and Michael P. Passaro breached their fiduciary duty to [Avery Abrasives], all of the principals vehemently denied that the activities of ISW hurt [Avery Abrasives] in any way. In fact, they all felt that [Avery Abrasives] benefited from the additional sales made to ISW . . ." Judge Chiota seems to equate the lack of perceived harm to Avery Abrasives with a resulting inability of the plaintiffs to demonstrate a breach of fiduciary duty. To the contrary, damages resulting from a breach of fiduciary duty in the context of the corporate opportunity doctrine do
 not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Guth v. Loft, supra,
5 A.2d 510.
Therefore, in order for Judge Chiota to have accurately assessed the merits of the plaintiffs' claim, he should have determined whether ISW usurped a corporate opportunity pursuant to the line of business test outlined in Guth v. Loft and, if so, what benefit the defendants received from so doing. From his report, it appears that Judge Chiota did not determine, pursuant to any recognized legal authority, whether ISW's operations were within Avery Abrasives' line of business and would have been of practical advantage to Avery Abrasives. Nor did Judge Chiota sufficiently address the potential conflict of interest that might arise from ISW's purchase of materials from and sale of products to Avery Abrasives.
In addition, Judge Chiota did not examine ISW's financial records so as to determine, with any degree of accuracy, what damages might be available to Avery Abrasives if ISW's operations were deemed to be within Avery Abrasives' line of business. If Judge Chiota did base his conclusions on specific legal CT Page 5482 authority, there is no indication in his report of which of the several legal standards he used to guide his analysis. It is possible that Judge Chiota viewed himself as a finder of fact, but his conclusions were conclusions of law, and therefore required some legal foundation.
In Judge Chiota's defense, he testified that he never expected the committee to rely upon his report exclusively. However, the committee did not provide evidence of any additional fact finding or legal research that would have augmented its ultimate conclusion that the plaintiffs' suit against Avery Abrasives was without merit. Instead, the committee brought Judge Chiota's report to the attention of the full board of directors of Avery Abrasives, and recommended that Avery Abrasives oppose the suit. Therefore, the litigation committee did not perform a reasonable inquiry into the merits of the plaintiffs' suit.
The plaintiffs also argue that Judge Chiota was biased in his assessment of the merits of the plaintiffs' suit. They contend that, among other things, notes, handwritten by Judge Chiota in connection with his interviews with Ray and Craig Avery and Michael Passaro reveal that Judge Chiota approached his duties as independent counsel to the committee as an ally of the defendants and that his recommendations were tailored to meet the requirements of the defendants. For example, the plaintiffs point to question 17 in Judge Chiota's handwritten summary, which states "[w]hat are the weak points of our case?" The plaintiffs argue that Judge Chiota's use of the phrase "our case" reveals that Judge Chiota viewed himself as an advocate for the defendants, not as a neutral, independent arbiter. As another example, the plaintiffs note Judge Chiota's identification of what he calls a "possible strategy/defense" in which he identifies perceived weaknesses in the plaintiffs' case and strengths in Craig Avery and Passaro's case. Chiota recommends, as part of his proposed strategy, that the defendants "use RA [Raymond Avery] as much as possible — very persuasive." The plaintiffs contend that this recommendation and others further illustrate Judge Chiota's bias.
Judge Chiota was purportedly charged with making an independent evaluation of the plaintiffs' derivative action. In performing these duties, it was incumbent upon Judge Chiota to examine and report upon the strengths and weaknesses of the plaintiffs' case. Some of the notes that the plaintiffs contend demonstrate that Judge Chiota was biased may have been notes that CT Page 5483 Judge Chiota made in order to help himself organize and prepare his report to the committee. However, taken together, the court agrees with the plaintiffs that certain excerpts of Judge Chiota's notes demonstrate that Judge Chiota did not approach his duties independently, but rather, adopted the posture of an advocate for the defendants. As such, Judge Chiota's report was not made in good faith after a reasonable inquiry into the merits of the plaintiffs' claims. Moreover, because the committee did not perform any other substantial inquiry into the merits of the plaintiff's claims, the recommendation by the committee to oppose the plaintiffs' suit was tainted by Judge Chiota's bias. As Avery Abrasives admits in its memorandum of law in support of its motion to dismiss, "under any of the above described approaches, this court must first satisfy itself that the Committee is independent, acting in good faith and has a reasonable basis for its conclusion that this suit should be dismissed." Because Avery Abrasives' committee failed to satisfy these requirements, Avery Abrasives' motion to dismiss as to counts I, III, IV and V is denied.
Avery Abrasives has also moved to dismiss counts II and VI of the plaintiffs' complaint, Because the grounds for the motion as to those two counts do implicate the court's jurisdiction, the motion is denied as to them as well.
B. The Merits of the Plaintiffs' Claims
As stated above "if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself." Guth v. Loft, supra, 5 A.2d 511. While the expression "in the line of' a corporation's business "is not within the field of precise definition . . . where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the CT Page 5484 corporation's business." Id. 514. The bounds of a corporation's line of business depend upon the "facts and circumstances of the particular case." Id.
Pursuant to the line of business test set forth in Guth v.Loft, the manufacture of abrasive cutting wheels of diameters of four inches and less was and is within Avery Abrasives' line of business. The evidence adduced at trial demonstrates that ISW and Avery Abrasives shared some of each other's customers, ISW used materials procured from Avery Abrasives to manufacture its products, ISW products were advertised in Avery Abrasives' promotional material. Moreover, some years prior to the inception of ISW, Avery Abrasives manufactured small diameter cutting wheels. The minutes of a board of directors meeting held January 28, 1977 (several weeks after ISW was incorporated), reflect a proposal by Raymond Avery to the board that Avery Abrasives expand to accommodate the production of "small wheels." In fact, Craig Avery and Michael Passaro sought Ray Avery's permission before starting ISW precisely because the businesses were so similar. Craig Avery testified that he would not have formed ISW had Raymond Avery not given his permission. Therefore, ISW's operations were within Avery Abrasives' line of business, and the manufacture of small diameter wheels was Avery Abrasives' corporate opportunity. Accordingly, barring a valid defense, Craig Avery and Passaro were not at liberty to surp Avery Abrasives' corporate opportunity by operating ISW.
Nevertheless, "[a]s with any general prohibition, theories exist by which [an] executive may, without liability, take advantage of opportunities that are deemed corporate. Upon full disclosure of material facts, the corporation (by majority vote of disinterested shareholders or directors) may reject the opportunity, thereby allowing the executive to pursue it. This disclosure must occur prior to the executive's pursuit of the opportunity." In re Albion Disposal, Inc., 152 B.R. 794. 818 (Bankr. W.D.N.Y., 1993); see also CFSM Corp. v. Elbert McKeeCo., 870 F. Sup. 819, 830, (N.D.Ill. 1994); Northeast Harbor GolfClub, Inc. v. Harris, 661 A.2d 1146. 1150 (Me. 1995); Levy v.Markal Sales Corp., 268 Ill. App.3d 355, 643 N.E.2d 1206, 1216
(1994); Klinicki v. Lundgren, 298 Or. 662, 695 P.2d 906, 917-20
(1985).
Prior to forming ISW, Craig Avery and Passaro disclosed to Raymond Avery their plans to do so. They subsequently received Raymond Avery's permission to enter into business together CT Page 5485 manufacturing small diameter wheels. Raymond Avery believed, at the time, based on sound business judgment, that Avery Abrasives could not profitably reenter the business of manufacturing small diameter wheels. Nevertheless, the plaintiffs argue that Craig Avery's and Passaro's disclosure to Avery Abrasives of the plans to manufacture small diameter wheels was insufficient, and that Raymond Avery's rejection of the opportunity to reenter the small diameter wheel manufacturing business did not constitute Avery Abrasives' rejection of the opportunity. The plaintiffs argue that because Avery Abrasives' board of directors was never formally made aware of ISW's operations prior to ISW's inception, and because no vote of either the board of directors or Avery Abrasives' shareholders ever occurred rejecting the opportunity to reenter the small diameter wheel manufacturing business, Craig Avery and Passaro were not at liberty to form and operate ISW. The defendants argue in response that because Raymond Avery was responsible for the day to day operations of the company, the decision to reject the opportunity to reenter the business of manufacturing small diameter wheels was his alone to make. The defendants argue that no disclosure to the board or shareholders was required.
Other jurisdictions have imposed specific, formal requirements concerning a corporate a official's disclosure to a corporation of a corporate opportunity. See. e.g., In re AlbionDisposal, Inc., supra, 152 B.R. 818; Northeast Harbor Golf Clubs,Inc. v. Harris, supra, 661 A.2d 1150; Klinicki v. Lundgren,supra, 695 P.2d 919. Connecticut's Supreme and Appellate courts, however, have never addressed the formal disclosure and rejection requirements. Given the good faith effort of Craig Avery and Passaro to disclose their plans to form ISW to Avery Abrasives by informing Raymond Avery, its president and majority shareholder, and given Raymond Avery's rejection of the opportunity to reenter the small wheel manufacturing business, the court will not now punish Craig Avery and Passaro for failing to comply with formal disclosure requirements adopted in other jurisdictions, but never adopted in Connecticut. Therefore, Craig Avery and Passaro were entitled to form and operate ISW because they properly disclosed their plans to do so prior to ISW's inception, and received from Avery Abrasives' president and majority shareholder a rejection of the corporate opportunity Craig Avery and Passaro sought to exploit.
As to the allegations in the plaintiff's complaint that Craig Avery and Passaro breached their duties to Avery Abrasives by CT Page 5486 conducting ISW business while working at Avery Abrasives, any such misconduct was de minimums and did not adversely affect Craig Avery's or Passaro's job performance at Avery Abrasives. With respect to allegations that Craig Avery and/or Passaro stole materials and/or electricity from Avery Abrasives, or utilized equipment belonging to Avery Abrasives, the plaintiffs failed to establish the truth of those allegations. Nor did the plaintiffs establish that Craig Avery knowingly permitted Mary Sobek to conduct business for Monroe Abrasives while at work at Avery Abrasives. Even if they had established those allegations, no discernible damage to Avery Abrasives resulted from Sobek's conduct. The plaintiffs have also railed to establish that the defendants engaged in any unfair or deceptive trade practice. Last, because Craig Avery is not liable to the plaintiffs on any of the other counts of the plaintiffs' complaint, the court need not consider whether Craig Avery's transfer of his interest in his residence to his wife was fraudulent.
Accordingly, the court hereby enters judgment in favor of the defendants on all counts.
MORAN, J.