1999 ME 38

**NORTHEAST HARBOR
GOLF CLUB, INC.**

v.

**Nancy HARRIS.**

Supreme Judicial Court of Maine.

Argued Oct. 7, 1998.
Decided Feb. 19, 1999.

James B. Haddow (orally), Petrucelli & Martin, LLP, Portland, for plaintiff.

Jonathan T. Harris (orally), Philip M. Coffin, III, Lambert, Coffin, Rudman & Hochman, Portland, for defendant.

Before WATHEN, C.J., and CLIFFORD, DANA, SAUFLEY, ALEXANDER and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Nancy Harris appeals from a judgment ordering equitable relief entered in the Superior Court (Hancock County, *Atwood, J.*) in favor of Northeast Harbor Golf Club, Inc., following a non-jury trial. Harris contends that the court incorrectly determined that her purchase and development of property surrounding the Club was a corporate opportunity that she usurped, and further contends that any cause of action against her is barred by the statute of limitations and by laches. The Club cross-appeals, contending that, independent of usurping a corporate opportunity, Harris breached her fiduciary duty to the Club when she began developing

the property in 1988. Because we conclude that the court correctly determined that Harris usurped a corporate opportunity, but that the statute of limitations period within which the Club could have brought an action against Harris expired, and that laches applies to preclude any action not barred by the expiration of the limitations period, and that no other cause of action arose, we vacate the judgment.

[¶ 2] The Northeast Harbor Golf Club is a Maine corporation operating a golf course located in Mt. Desert. Nancy Harris served as president of the Club from 1971 until August of 1990. The Club is managed by the president and a board of directors. Although the board of directors was empowered to approve policy decisions, it was content to have Harris assume much of the responsibility for the Club's operation. Harris generously contributed to the Club throughout her tenure as president. In addition to her duties as president, she performed other tasks, including mowing and gardening. Moreover, to alleviate the Club's financial difficulties, Harris often purchased equipment for the Club with her own money and either leased or sold it to the corporation for a reduced price to ensure that the Club would not be forced to make substantial cash outlays.

[¶ 3] From 1972 until 1984, the board, at Harris's insistence, discussed either purchasing and developing land surrounding the Club or developing some of the Club's real estate in order to raise money. At the 1976 annual meeting, the Club was informed that a consultant, after investigating the matter, had concluded that the Club's land, surrounding the golf course, was suitable for development. In 1977, the board authorized Harris to form a committee to study in more detail developing some of the Club's land. The purpose of development was to improve the financial condition of the Club.

[¶ 4] At the 1982 meeting, Harris made it clear that she strongly advocated housing development on Club property and volunteered to finance construction of the first house. Although some directors opposed development, the board eventually approved building houses on Club property by a 14 to 4 vote. At the 1984 annual meeting, Harris presented an "Outline of Proposal for Sale and Management of Excess Land" and the board approved her proposal to sell two lots of Club land to raise revenue. No lots were ever sold.

[¶ 5] The subject of this lawsuit is land surrounding the Club that Harris purchased in her own name, some in 1979, and more in 1985. In 1979, in her capacity as Club president, Harris learned of an opportunity to purchase property owned by Lucy Gilpin.[1] The Gilpin property adjoins Club property, including the driveway which provided access to the golf course, the clubhouse, and a portion of the Club's parking lot. Moreover, the Gilpin property is encumbered by an easement that allows golfers to travel from the green of one hole to the tee area of the next hole.

[¶ 6] Harris purchased the Gilpin property in her own name for $45,000. She did not disclose her plans to the board prior to acquiring the property. The minutes from the Club's 1979 Board of Directors' meeting stated that "Harris reported that she had recently acquired the Gilpin land adjacent to the old first, second and third holes. Though she intends to hold the land for herself, the golf club will be protected." Harris contends that her statements were made to assure the Club that she would act responsibly, not that she would never develop the land. The board took no action in response to Harris's purchase. Harris testified that at the time she bought the land she had no plans to develop the property and that no such plans were formulated until 1988.

[¶ 7] In 1984, Harris, independent of her position with the Club,[2] learned of the availability of property owned by the Smallidge family. The property was surrounded on three sides by the Club and on the fourth

---

1. A Northeast Harbor real estate broker had approached Harris, because she was the president of the Club, and told her of an opportunity to purchase the property.

2. While playing golf with the postmaster of Northeast Harbor, Harris learned that property owned by the heirs of the Smallidge family might be available for purchase.

side by a house. Harris contracted to purchase eight of the ten interests of the Smallidge heirs in February of 1985, another in March, and the last in June of 1985, for a total of $60,000.[3] Harris disclosed the purchase to the board of directors at the Club's annual meeting on August 28, 1985. At the meeting, she apologized for delaying the construction of a shed approved the previous year, explaining that the construction was delayed because the site was adjacent to the Smallidge property and she did not want to "rock the boat" in her negotiations to purchase the land. She justified the purchase by stating that she wanted the land to remain in "friendly hands." The board took no formal action with respect to Harris's purchase.

[¶ 8] In December of 1988, Harris's son filed an application with the Mt. Desert Planning Board to subdivide part of the Gilpin property into five house lots to be named Bushwood. The plan was approved in June of 1991. The board of directors of the Club took no action to oppose the subdivision. A group of the Club's directors, however, formed a separate organization to oppose the subdivision, contending that it violated local zoning ordinances. The effort to oppose the subdivision did not succeed. Eventually the board became divided over development. In 1989, however, the board agreed that it "would not adopt any position" on Harris's son's pending subdivision application. Harris was asked for and gave her resignation in 1990. In 1991, the Club voted to challenge the Bushwood subdivision. The challenge, however, was not successful. *See Northeast Harbor Golf Club, Inc. v. Town of Mount Desert*, 618 A.2d 225 (Me.1992). The Club commenced this suit against Harris, on May 23, 1991, alleging that by purchasing the Gilpin and Smallidge properties she usurped an opportunity that belonged to the Club.

[¶ 9] The Superior Court initially concluded that Harris had not usurped a corporate opportunity because it found that the Club was not in the business of purchasing property and lacked the financial ability to do so. The Club appealed, and we adopted the American Law Institute's (ALI) definition of taking a corporate opportunity, vacated the judgment, and remanded the case to the Superior Court for trial of the facts pursuant to the ALI definition. *See Northeast Harbor Golf Club, Inc. v. Harris*, 661 A.2d 1146, 1150–52 (Me.1995). After remand, the Superior Court found that Harris had usurped a corporate opportunity and that the Club's claim was not barred by the statute of limitations. The court entered a judgment for the Club, imposed a constructive trust on the property owned by Harris, and ordered Harris to convey the properties to the Club on payment of the purchase price and interest and taxes. These appeals by Harris and the Club followed.

## I. APPEAL BY HARRIS

### A. Corporate Opportunity

[¶ 10] Harris concedes that, because she learned of the opportunity to purchase the Gilpin property in her capacity as president of the Club, her purchase of that property in 1979 constituted the taking of a corporate opportunity. *See* PRINCIPLES OF CORPORATE GOVERNANCE § 5.05(b)(1)(A) (American Law Institute, May 13, 1992). She disputes liability, relying on the statute of limitations and laches. Harris contends that because she learned of the availability of the Smallidge property independent of her position as an officer of the Club, and because the purchase of that land was not closely related to the Club's business, that there was no usurpation of a corporate opportunity. In reviewing the decision of the Superior Court, we defer to the historical factual findings of the court, but the determination of whether an opportunity is a "corporate opportunity" is a question of law that we review *de novo*. *See generally State v. O'Connor*, 681 A.2d 475, 476 (Me. 1996).

[¶ 11] Even if the opportunity to engage in a business activity, in which the officer or director becomes involved, is not learned of through her connection to the business of the corporation, nevertheless,

3. In 1990, because the Smallidge property was landlocked, Harris purchased a house and property separating the Smallidge property from the road for $275,000.

such an opportunity may be considered a corporate opportunity if the officer or director knows it "is closely related to a business in which the corporation is engaged or expects to engage." PRINCIPLES OF CORPORATE GOVERNANCE § 5.50(b)(2).[4]

 [¶ 12] "The central feature of the ALI test is the strict requirement of full disclosure prior to taking advantage of any corporate opportunity." *Northeast Harbor Golf Club*, 661 A.2d at 1151. This feature was designed to prevent individual directors and officers from substituting their own judgment for that of the corporation when determining whether it would be in the corporate interest, or whether the corporation is financially or otherwise able to take advantage of an opportunity. *See Ostrowski v. Avery*, 243 Conn. 355, 703 A.2d 117, 126 (1997) (citing Note, *When Opportunity Knocks: An Analysis of the Brudney & Clark and ALI Principles of Corporate Governance Proposals for Deciding Corporate Opportunity Claims*, 28 CORP. PRAC. COMMENTATOR 507, 516 (1987)). Doubt about the financial capacity of a corporation to pursue an opportunity may affect the incentive of a director or officer to solve corporate financing problems, and evidence regarding the corporation's financial status is often controlled by the usurping corporate director or officer. *See* Victor Brudney &· Robert Charles Clark, *A New Look at Corporate Opportunities*, 94 HARV. L. REV. 998, 1020–22 (1981). The ALI approach recognizes the danger in allowing an individual director or officer to determine whether a corporation has the ability to take an opportunity, and accordingly disclosure to the corporation is required.

 [¶ 13] Full disclosure is likewise important to prevent individual directors and officers from üsing their own unfettered judgment to determine whether the business opportunity is related to the corporation's business, such that it would be in the corporate interest to take advantage of that opportunity. "The appropriate method to determine whether or not a corporate opportunity exists is to let the corporation decide at the time the opportunity is presented." 3 FLETCHER CYC. CORP. § 861.10, p. 285 (1994). This rule protects individual directors and officers because after disclosing the potential opportunity to the corporation, they can pursue their own business ventures free from the possibility of a lawsuit. If there is doubt as to whether a business opportunity is closely related to the business of the corporation, that doubt must be resolved in favor of the corporation so that the officer or director will have a strong incentive to disclose any business opportunity even remotely related to the business of the corporation.

 [¶ 14] In this case, the Club's normal business is maintaining and operating a golf course. That business is dependent on having sufficient land for the course itself and ensuring that the activity of golf is not hindered or affected by development of adjacent and surrounding property. The Club had frequently discussed developing some of its own land and on one occasion talked about the possibility of purchasing and developing adjacent land. The purchase of the Smallidge land, surrounded as it is on three sides by the Club's land and adjacent to three of its golf holes, land that could be developed, is, in the circumstances of this case, suffi-

---

4. The ALI defines corporate opportunity as:
 (1) Any opportunity to engage in a business activity of which a director or senior executive becomes aware, either:
 (A) In connection with the performance of functions as a director or senior executive, or under circumstances that should reasonably lead the director or senior executive to believe that the person offering the opportunity expects it to be offered to the corporation; or
 (B) Through the use of corporate information or property, if the resulting opportunity is one that the director or senior executive should reasonably be expected to believe would be of interest to the corporation; or

 (2) Any opportunity to engage in a business activity of which a senior executive becomes aware and knows is *closely related* to a business in which the corporation is *engaged or expects to engage*.
 PRINCIPLES OF CORPORATE GOVERNANCE § 5.05(b) (emphasis added). Section 505(b)(1) applies to Harris's purchase of the Gilpin property. Because Harris did not become aware that the Smallidge property was available for purchase in her capacity as Club president, section 5.05(b)(2) is *applicable to the purchase of that property.*

ciently related to the Club's business to constitute a corporate opportunity. Accordingly, Harris would be liable to the Club for taking advantage of a corporate opportunity for purchases of both the Gilpin and Smallidge properties unless the Club's action is barred by the statute of limitations, or is otherwise barred by laches.

### B. Statute Of Limitations

[¶ 15] Harris contends that the statute of limitations bars both claims. The statute of limitations is an affirmative defense and the burden of establishing the expiration of the limitations period is on the party asserting it. *See Nuccio v. Nuccio,* 673 A.2d 1331, 1334 (Me.1996) (citing *Kasu Corp. v. Blake, Hall & Sprague, Inc.,* 540 A.2d 1112, 1113 (Me.1988)); M.R. Civ. P. 8(c). Determining whether the statutory limitations period has expired requires a determination of when a cause of action for taking a corporate opportunity accrues. *See Anderson v. Neal,* 428 A.2d 1189, 1190 (Me. 1981).

[¶ 16] The limitations period applicable to the Club's action for usurping a corporate opportunity is six years. "All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards." 14 M.R.S.A. § 752 (1980). A cause of action accrues "the moment when a wrongful action produces an injury for which a plaintiff is entitled to seek vindication." *Myrick v. James,* 444 A.2d 987, 994 (Me. 1982). The gravamen of the cause of action of usurping a corporate opportunity is the taking advantage of a such an opportunity without first offering it to the corporation. *See* PRINCIPLES OF CORPORATE GOVERNANCE § 5.05(a)(1).[5] The Club had a cause of action for taking a corporate opportunity entitling it to seek judicial vindication against Harris, when Harris, as an officer of the Club, took the opportunity to purchase the Gilpin and Smallidge properties in 1979 and 1985 respectively, without first offering those prop-

erties to the corporation. *See Northeast Harbor Golf Club, Inc. v. Harris,* 661 A.2d 1146, 1151–52 (Me.1995).

[¶ 17] The Club filed its complaint on May 23, 1991, twelve years after Harris purchased the Gilpin property. Harris notified the board of directors of the purchase in 1979. The statute of limitations bars the Club's claim against Harris for the purchase of the Gilpin property.

[¶ 18] In 1985, Harris contracted to purchase the Smallidge property in three separate transactions. In the first two transactions in February and March of 1985, she contracted to purchase nine of the ten interests from the owners of the land. Applying the six year statute of limitations, any action against Harris for purchasing these nine interests had to be filed by February and March of 1991 respectively. Because the Club did not bring suit against Harris until May 23, 1991, the Club's action with respect to those interests is barred because it was not brought within the limitations period.

[¶ 19] The only portion of the Smallidge property purchased within the limitations period was the one-tenth interest that Harris purchased on June 11, 1985. Harris contends that the Club's actions as to that one-tenth interest is barred by laches. She argues that the Club unreasonably delayed in filing a claim against her, and that because she invested substantial money in developing the Smallidge property she would suffer substantial prejudice were the Club's suit allowed to proceed. We agree. "Laches is the omission to assert a right for an unreasonable and unexplained length of time...." *Longley v. Knapp,* 1998 ME 142, ¶ 10, 713 A.2d 939. "It exists when the omission to assert the right has continued for an unreasonable and unexplained lapse of time, and under circumstances where the delay has been prejudicial to an adverse party, and where it would be inequitable to enforce the right." *Fisco v. Department of Human Servs.,* 659 A.2d 274, 275 (Me.1995). Wheth-

---

5. The opportunity must be rejected by a majority of disinterested directors, after full disclosure, or in the alternative, the director or officer taking the opportunity must prove that the taking of the opportunity was fair to the corporation. *See id.*

at § 5.05(a)(2)-(3). Fairness to the corporation is no defense, however, if the opportunity is taken without first offering it to the corporation. *Id.*

er the equitable doctrine of laches applies in a given circumstance is a question of law. *See H.E. Sargent v. Town of Wells,* 676 A.2d 920, 926 (Me.1996).

[¶ 20] Harris notified the board at the annual meeting in August 1985 that she had purchased the Smallidge property. The board took no action with respect to the purchase. Even after learning that Harris intended to develop the property, the board agreed that it "would not adopt any position" on Harris's son's pending subdivision application. In 1990, in reliance on the Club's position and to further her plans to develop the Smallidge property, Harris purchased property separating the Smallidge property from the road for $275,000. There is nothing to indicate that Harris would have purchased the property in the absence of her plans for development. Should the board prevail in its claim for taking a corporate opportunity, that investment, made to ensure that the Bushwood development would not be landlocked, would be substantially wasted. The Club's claim regarding the one-tenth interest of the Smallidge property is barred by laches.

[¶ 21] The Superior Court concluded that the Club's claim is not barred by the statute of limitations because the cause of action for usurping a corporate opportunity did not accrue as to any of the property until Harris began to actively develop the property in 1988. The court relied on the fact that Harris was an influential club member; on Harris's statement to the board of directors in 1979, when she purchased the Gilpin property, that the "Club will be protected;" that she had often purchased equipment for the Club and either leased it or sold it to the Club to prevent it from having to make large cash outlays; and that she told the Club after purchasing the Smallidge property that "she wanted the property to remain in friendly hands." The court found that the Club could reasonably have believed that Harris bought the property solely for the benefit of the Club.

[¶ 22] The limitations period, however, begins to run as soon as a cause of action accrues, and in the absence of fraud,[6]

its running is not delayed even if the cause of action is not immediately discovered. *See Kasu Corp. v. Blake, Hall & Sprague, Inc.,* 582 A.2d 978, 980 (Me.1990); *Bangor Water Dist. v. Malcolm Pirnie Eng'rs,* 534 A.2d 1326, 1328 (Me.1988). The court's ruling in effect applies the discovery rule to extend the statute of limitations beyond the six year period with respect to the Smallidge property, and indeed well beyond the six years in the case of the Gilpin property. *See Sabre Farms, Inc. v. Jordan,* 78 Or.App. 323, 717 P.2d 156, 159 (1986) (fact that board of directors did not have enough information about the transaction to realize a corporate opportunity existed or was usurped did not prevent the running of statute of limitations period).

[¶ 23] The only basis on which the Club could rely in these circumstances to avoid the consequences of bringing suit beyond the limitations period is the principle of estoppel, pursuant to which a defendant may be estopped from raising the statute of limitations defense. *See Nuccio v. Nuccio,* 673 A.2d 1331, 1334 (Me.1996); *Hanusek v. Southern Maine Medical Ctr.,* 584 A.2d 634, 636 & n. 2 (Me.1990).

> The gist of an estoppel barring the defendant from invoking the defense of the statute of limitations is that the defendant has conducted [herself] in such a manner which actually induces the plaintiff not to take timely legal action on a claim .... Only upon a demonstration that the plaintiff had in fact intended to seek legal redresses on [its] claim during the prescripting period can [its] failure to file suit be specifically attributed to the defendant's conduct.

*Nuccio,* 673 A.2d at 1334 (quoting *Townsend v. Appel,* 446 A.2d 1132, 1134 (Me.1982)). In *Nuccio,* we stated that equitable estoppel should be "carefully and sparingly applied." *Nuccio,* 673 A.2d at 1334. In this case, the Superior Court rejected the Club's estoppel theory, concluding that the Club failed to meet its burden to clearly prove that Harris

---

6. *See* 14 M.R.S.A. § 859 (Supp.1997). The court

found no fraud on the part of Harris.

intended to induce the Club not to act. Moreover, the Club failed to show that in the absence of any statements made by Harris, that the Club, in fact, would have filed a claim against Harris for usurping a corporate opportunity. The evidence showed that the Club was not prepared to file such a claim, and indeed, in 1989 voted not to oppose the subdivision application. Based on the court's findings, Harris is not estopped from asserting the statute of limitations as a defense.

## II. CROSS APPEAL OF THE CLUB

[¶ 24] In its cross-appeal the Club contends that Harris breached her fiduciary duty to the corporation, independent of a corporate opportunity, when she decided to develop the properties in 1988 because development was contrary to the Club's interests.[7] Maine law requires that "[t]he directors and officers of a corporation shall exercise their powers and discharge their duties in good faith with a view to the interests of the corporation ...." 13–A. M.R.S.A. § 716 (Supp.1998). It follows that directors and officers cannot "serve themselves and the corporation at the same time," *Northeast Harbor Golf Club, Inc. v. Harris*, 661 A.2d 1146, 1150 (Me.1995) (quoting *Camden Land Co. v. Lewis*, 101 Me. 78, 97, 63 A. 523, 531 (1905)), nor can they "secure a private advantage at the expense of the corporation." 3 FLETCHER CYC. CORP. § 837.5.(Permanent ed.1994). Whether a director or officer breaches her duty of loyalty is primarily a question of fact. *See Broz v. Cellular Info. Systems, Inc.*, 673 A.2d 148, 154 (De.1996). We review issues of fact for clear error. *See, e.g., White v. Zela*, 1997 ME 8, ¶ 3, 687 A.2d 645.

[¶ 25] When personal interests diverge from the corporation's interest, a conflict of interest arises. To establish a conflict of interest, the Club would have to show that,

while Harris was a director and officer of the Club, the development of land surrounding the golf course was contrary to the Club's interests. The last time we reviewed this case, we noted that the "record would support a finding that the Club had made the policy judgment that development of surrounding real estate was detrimental to the best interests of the Club." *Northeast Harbor Golf Club, Inc.*, 661 A.2d at 1149. In the decision on remand, however, the trial court found that the Club had "never adopted expressly or by implication any policy of nondevelopment."[8] There is competent evidence in the record to support that factual finding. In the 1970's and 1980's, in an effort to improve its financial condition, the board took steps toward developing its own surrounding real estate: in 1977 the board authorized Harris to form a committee to study development; in 1982 the board voted to approve a plan to build five houses on Club land; in 1983 the board resolved that "the land development project should go forward if at least three lots were sold;" and in 1984 the board reached a consensus "that the Club would entertain a proposal for one or two people to ... buy two lots ...." Although some members of the board expressed concerns, the majority of the board always supported cautious steps toward development.

[¶ 26] To support its contention that the corporation had a policy against development, the Club relies entirely on the minutes of the 1988 meeting. Although those minutes show that "concerns" were expressed regarding the undesirability of development, they also reflect sentiment that development could be of interest to the Club at some time in the future. In light of the steps the board had taken toward development in the 1970's and 1980's, the court's finding that the Club had not adopted a policy of nondevelopment is not clearly erroneous.

---

7. The breach of fiduciary duty cause of action was alleged against Harris in an amended complaint.

8. Because the trial court found that Harris's usurpation of a corporate opportunity was a viable cause of action, it never directly addressed the Club's separate count of a breach of fiduciary duty arising out of Harris's decision to develop her property. The court, however, did make the finding of fact concerning a policy of nondevelopment while addressing the Club's claim that Harris usurped a corporate opportunity by buying the properties.

[¶ 27] Accordingly, there is insufficient evidence to support an additional cause of action for a conflict of interest in 1988 when Harris began developing the property.

The entry is:

Judgment vacated. Remanded to the Superior Court for entry of a judgment for the defendant.