FILED
10/10/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 11, 2018 Session

## JAMES MULLOY ET AL. v. EUGENE G. MULLOY, JR. ET AL.

Appeal from the Chancery Court for Davidson County
No. 15-992-IV     Russell T. Perkins, Chancellor

_____

No. M2017-01949-COA-R3-CV

_____

Two brothers formed a limited liability company to own and lease a commercial property. When the tenant sought to expand, both brothers sought to find a suitable space for the tenant to lease. The younger of the two brothers found a property that would ideally suit the tenant's needs, a fact that was communicated to his brother. The older brother purchased the property through a newly created limited liability company without his younger sibling's involvement. The older brother's new limited liability company then leased the new property to the tenant. The younger brother brought a derivative suit against his brother and the newly formed limited liability company, claiming usurpation of a corporate opportunity belonging to the limited liability company that the brothers had formed together and tortious interference with business relationships. The younger brother also claimed unjust enrichment. Following a trial, the chancery court found in favor of the older brother and his newly formed limited liability company and dismissed the complaint. After our review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

Samuel P. Funk and D. Gil Schuette, Nashville, Tennessee, for the appellants, James Mulloy and Chemical Properties, LLC.

Garry K. Grooms, Nashville, Tennessee, for the appellees, Eugene Mulloy, Jr., and Cockrill Bend Properties, LLC.

# OPINION

## I.

### A. THE BROTHERS

In 1996, brothers Eugene "Gene" Mulloy, Jr. and James Mulloy acquired their parents' shares in the family business, Nashville Chemical & Equipment Company, Inc. ("NCE"), becoming 50/50 owners. As part of that transaction, the brothers formed Chemical Properties, LLC to purchase the property where NCE did business, 7001 Westbelt Drive in Nashville (the "Westbelt Property"). Chemical Properties then leased the Westbelt Property back to NCE under a triple net lease.[1] The Westbelt Property and the lease with NCE were Chemical Properties' only assets.

Like NCE, the brothers owned Chemical Properties equally. But Gene,[2] the older of the two brothers, served as chief manager, while James served as secretary. The brothers split the profits from Chemical Properties equally. James described it as "a great investment" because "essentially you have somebody else pay for your asset and you receive distributions and they pay for, you know, all the expenses of taxes, and maintenance and, you know, anything that occurs."

In 2011, the brothers sold most of their shares in NCE to Triwater Holdings LLC. Triwater Holdings brought in its own chief executive officer, Mike Reardon, to serve as the chief executive officer of NCE. But both brothers retained management positions in NCE, reporting to Mr. Reardon. The brothers also retained minority stock interests in NCE. NCE continued to operate on the Westbelt Property under its lease with Chemical Properties, which the brothers still co-owned.

After the sale, NCE's business grew, driving the company to look for additional space to lease. Gene, who was now president of NCE, led the effort with the assistance of Anthony "Tony" Allison, the company's vice-president of operations. The search went on for months, and even with the assistance of local and national commercial real estate firms, a suitable property could not be found until sometime in 2014. During that period, Gene and Mr. Allison came across manufacturing space in Ashland City that was soon to be vacant. After touring the property, Gene approached the owner about leasing the space to NCE. Instead, the owner wanted to sell the property.

---

[1] Also known as a "net-net-net lease," a triple net lease is "[a] lease in which the lessee pays all the expenses, including mortgage interest and amortization, leaving the lessor with an amount free of all claims." *Lease*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[2] Although the Court typically refers to parties by their surname, we use the parties' given names to avoid confusion. We intend no disrespect.

Gene reported the news to Mr. Reardon. The private equity investors in NCE were not interested in owning real estate, so Mr. Reardon suggested a third party might buy the Ashland City property and lease it to NCE. Gene proposed that he fill the role of buyer. So he signed an option to purchase the Ashland City property while he carried out further due diligence.

James learned of Gene's plans to purchase the Ashland City property around Christmas of 2014. By then, James had been away from the day-to-day operations of NCE for nearly a year. He had joined Triwater Holdings, assisting with the identification of potential acquisition targets. James thought that the Ashland City facility was "terrible" and "felt strongly that the owners [of NCE] would look at that building and not feel like it would be worthwhile." For those reasons, he did not initially communicate with Gene about the property.

## B. THE COCKRILL BEND WAREHOUSE

On January 7, 2015, during a meeting in Chicago, Mr. Reardon asked James to assist NCE in finding some space in Nashville. James understood from that request that he should "go home and put [his] Chemical Properties hat on because that's the entity that leases property for [NCE] and supplies that need." But James acknowledged that neither he nor Mr. Reardon mentioned Chemical Properties at the meeting.

Back in Nashville the following day, James called a friend in the commercial real estate business, Mike Gorney, about NCE's space needs. Mr. Gorney responded with a list of buildings in close proximity to the Westbelt Property. But he highlighted one prospect in particular, office/warehouse space at 7344 Cockrill Bend Boulevard (the "Cockrill Bend Warehouse"). Mr. Gorney emailed that he "would not be surprised if your brother [wa]s looking at this [property]." The leasing agent for the Cockrill Bend Warehouse advised Mr. Gorney that the owner of the property was interested in selling as well as leasing. So Mr. Gorney told the leasing agent "to put me in the mix to purchase."

In reply to Mr. Gorney, James emailed that the Cockrill Bend Warehouse "looks like a perfect opportunity." He inquired about a potential purchase price and, alternatively, about lease rates. James also emailed Tony Allison at NCE, asking if he had looked at the Cockrill Bend Warehouse.

By this point, however, the opportunity to purchase appeared to be over. The same day as the email exchanges between James and Mr. Gorney and James and Mr. Allison, the owner of the Cockrill Bend Warehouse, JCH Development Company, Inc., signed a contract to sell the property to a California buyer for $1.8 million.

Unaware of the purchase contract, on January 9, Mr. Gorney emailed the leasing agent to express his interest "in signing a contract immediately to acquire the [Cockrill

3

Bend Warehouse] . . . for a total purchase of $2,356,100." Mr. Gorney made the offer on behalf of his company, Gorney Realty Partners, LLC. James did not authorize the offer, but Mr. Gorney later explained that, had the offer been accepted, he and James would have "work[ed] out some kind of agreement to get everyone treated fairly."

Meanwhile, having received the information from James on the Cockrill Bend Warehouse, Mr. Allison made his own call to the leasing agent. The leasing agent told him that the property was already under contract. This prompted Mr. Allison to call James. Mr. Allison recalled that he was told by James that "Mike Gorney knows who has the option on that property and [Mr. Gorney] believes that he has an opportunity to get it." James recalled only suggesting that Mr. Gorney may have had some sort of "in" based on Mr. Gorney's email reporting that he asked to be put "in the mix to purchase."

Whatever was said, it was enough for Gene and Mr. Allison to give the Cockrill Bend Warehouse a look or, rather, another look. Given its close proximity to the Westbelt Property, both Gene and Mr. Allison were familiar with the Cockrill Bend Warehouse and that space was advertised for lease there. But both men had ruled the property out because it was already partially leased. The nature of NCE's business made it important to them to lease the entire building.

Mr. Gorney scheduled a site visit for the following Monday, January 12. That afternoon, Gene, Mr. Allison, and another NCE employee met Mr. Gorney and the leasing agent at the Cockrill Bend Warehouse. James could not attend. Gene and Mr. Allison thought the property would suit NCE's needs, and Gene remembered discussing NCE possibly leasing the property from either "Mike Gorney or some entity that he created." Then the group met John Coleman Hayes, the president of the owner of the Cockrill Bend Warehouse, JCH Development.

Mr. Gorney recalled Mr. Hayes remarking that he wished that they had shown up earlier because the warehouse was already tied up with another purchaser. Mr. Gorney believed that this interaction with Mr. Hayes may have been when he first learned that the property was under contract.

Gene and Mr. Hayes knew of each other from their county club but had not met. Gene thought Mr. Hayes seemed surprised by the site visit and acted as if the visit was an interruption. Gene recounted Mr. Hayes saying something to the effect of "I don't know why you all are here" and "[y]ou all are wasting your time." It would later be revealed that Mr. Hayes may not have seen the emails from the leasing agent forwarding Mr. Gorney's purchase offer and advising of the building tour.

The site visit ended shortly after the group's encounter with Mr. Hayes. Afterward, Gene wanted to know what was going on, so he and the other NCE representatives met with Mr. Gorney back at NCE. Mr. Gorney remembered explaining

4

that he was "in a backup position to purchase the property." Both Gene and Mr. Allison had a different recollection. They recalled Mr. Gorney representing that he had an option to purchase the property. They also recalled Mr. Gorney stating that his option had no expiration date. Gene found the idea of an open-ended option unbelievable, causing Gene to distrust Mr. Gorney.

Following the meeting, Gene called Mr. Hayes to "tell him our side of the story because we obviously disrupted his business." During this call, Gene confirmed his suspicion that Mr. Gorney did not have an option to purchase Cockrill Bend Warehouse. Gene also expressed an interest in buying the property if the contract with the California buyer did not close. Mr. Hayes agreed to let Gene be "first in line" because "it seemed like a perfect fit" and he "just had a really good feeling about" Gene.

C. THE OPPORTUNITY

In late January, Gene sent an email advising James of several matters relative to their limited liability company, Chemical Properties. Gene reported filing the company's annual report and its franchise and excise tax exemption renewal and giving the company's bank statements to another individual for preparation of tax returns. James replied, thanking him for the update and "BTW- I just wanted to ask why the building expansion for NC[E] wouldn't be handled by Chemical Properties?" James added: "Seems like this was one business venture that seemed to work."

Gene's reply email referenced his lengthy pursuit of a solution to NCE's space needs and the fact that James's "attention ha[d] been focused elsewhere." After a response from James, Gene made himself clear. He wrote that he was not "looking for a partner for this new venture." At this point, the Cockrill Bend Warehouse was no longer an option, and Gene was back to pursuing the Ashland City property as a second location for NCE. Gene reminded James that they "agreed to sell [NCE] in 2011, primarily because we were at an impasse and could not move our company forward as partners in business." Gene wrote, "I cannot see how another partnership together can lead to business success or relational development."

As luck would have it, the Ashland City property would not be the only option for NCE's space needs. On February 20, 2015, JCH Development and the California buyer entered into an agreement terminating their contract.

The timing was fortuitous. The day before, representatives from Triwater Holdings, including Mr. Reardon, came to town to look at the Ashland City property. As James had predicted, the Triwater Holdings representatives were not impressed with the property. When they arrived, they did not even get out of the car. On the drive back to NCE, Gene told Mr. Reardon about the Cockrill Bend Warehouse and of the possibility that it might be available.

While pursuing the Ashland City property, Gene stayed in touch with Mr. Hayes. Mr. Hayes alerted Gene when the termination agreement was signed. Soon thereafter, NCE's attention turned to the Cockrill Bend Warehouse. But it was not a foregone conclusion. As Gene explained, the private equity investors behind Triwater Holdings "were really trying to make a decision [of] whether they wanted to invest in a larger facility in Nashville . . . under any circumstances." And he thought that was one of the reasons that the Ashland City property was determined to be unsuitable; the property would have required too large of an investment.

Still there were reasons to move quickly. Besides Gene, Mr. Hayes had two other parties interested in the Cockrill Bend Warehouse. One of those was Mr. Gorney. On February 26, 2015, Mr. Gorney sent the leasing agent for the Cockrill Bend Warehouse a letter of intent to purchase the property for $2.1 million. Mr. Gorney made the offer on behalf of Gorney Realty Partners, again without consulting James.

Gene advocated for the Cockrill Bend Warehouse and worked on a presentation to justify NCE's expansion into the property. Eventually, he obtained a commitment from NCE that it would lease the Cockrill Bend Warehouse for a term of at least ten years if he acquired the property. On March 31, 2015, Gene and JCH Development signed a contract for the sale of the property for $2.325 million.

In a phone call with their mother, James learned of Gene's efforts to purchase the property. James was "shocked" that, without his or Mr. Gorney's knowledge, Gene was having discussions with Mr. Hayes. On April 15, James sent the following email to Gene:

> Gene,
>
> I just heard from Mike Gorney that you have a contract on the Cockrill Bend building that Mike and I found for Nashville Chemical. Given my effort to bring the opportunity to you, it would seem appropriate to buy the property through Chemical Properties. Wouldn't you think so!
>
> Your thoughts
> James

Gene did not respond.

On June 8, 2015, the sale of the Cockrill Bend Warehouse closed. Gene formed a new limited liability company, Cockrill Bend Properties, LLC, to own the property. Cockrill Bend Properties then leased the property to NCE, using an agreement adapted

from the lease between Chemical Properties and NCE. Almost immediately Cockrill Bend Properties turned a profit.

## D. THE LAWSUIT

On behalf of Chemical Properties, James filed a derivative suit against Gene for breach of fiduciary duty and against Gene and Cockrill Bend Properties for tortious interference with a business relationship. James also brought claims on his own behalf against his brother for breach of fiduciary duty and unjust enrichment. The breach of fiduciary duty and tortious interference claims were founded on the allegation that Gene usurped a corporate opportunity belonging to Chemical Properties, specifically the opportunity to purchase the Cockrill Bend Warehouse and lease it to NCE. James claimed unjust enrichment because he had "conferred a benefit on Gene . . . by providing him with knowledge concerning the availability of the Cockrill Bend [Warehouse]."

Gene defended on the basis that the purchase of the Cockrill Bend Warehouse was not a corporate opportunity of Chemical Properties. He denied that James acted in his capacity as a member of Chemical Properties when he sought to assist with the search for additional space for NCE. He also denied that Mr. Gorney acted on behalf of Chemical Properties. While admitting that James sent information on the Cockrill Bend Warehouse, Gene noted that he was already aware of the property, that the property was publicly advertised as being available for lease, and that the property was already under contract to a third party when James provided the information.

Gene also asserted that all claims were barred by the operating agreement of Chemical Properties. Specifically, the operating agreement permitted Gene, as chief manager, to "engage in whatever other activities he so chooses, whether or not such activities compete with the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Member." The operating agreement also authorized members to "engage in or possess an interest in other business ventures of every nature and description." By its terms, neither Chemical Properties nor the other member "shall have any rights in and to such independent ventures or the income or profits derived therefrom."

Following a bench trial, the Chancery Court for Davidson County entered a memorandum and final order dismissing the claims of James and Chemical Properties.[3] The court determined that the breach of fiduciary duty claim solely turned on the question of whether Gene usurped a corporate opportunity of Chemical Properties. In finding no corporate opportunity, the court faulted James and Chemical Properties for not proving

---

[3] The court certified its order as final under Tennessee Rule of Civil Procedure 54.02. The court did not rule on a request by Gene and Cockrill Bend Properties for recovery of attorney's fees under Tennessee Code Annotated § 48-249-804(a) (2019).

that Chemical Properties "had a reasonable expectancy regarding the acquisition of the Cockrill Bend [Warehouse]." The court also found it significant that the opportunity to purchase the Cockrill Bend Warehouse was not offered to Gene in his capacity as chief manager of Chemical Properties.

The court rejected the tortious interference with business relationship claim for several reasons. Among other things, the court found that Gene's actions did not interfere with any existing business relationship between Chemical Properties and NCE. The proof showed that NCE still leased the Westbelt Property from Chemical Properties. And James and Chemical Properties did not establish that the Cockrill Bend Warehouse lease was a prospective business relationship of Chemical Properties.

Finally, the court concluded that James could not recover on his unjust enrichment claim. It reasoned that courts only impose a contractual obligation under an unjust enrichment theory when there is no enforceable contract between the parties. Here, the operating agreement for Chemical Properties was an enforceable contract between James and Gene. Additionally, "the proof did not establish that James Mulloy actually conferred the 'benefit' of the Cockrill Bend [Warehouse] transaction on Gene Mulloy."

## II.

On appeal, James and Chemical Properties challenge the dismissal of the breach of fiduciary duty claim based on the determination that the opportunity to purchase the Cockrill Bend Warehouse was not a corporate opportunity of Chemical Properties.[4] And James challenges the dismissal of his unjust enrichment claim. Because the dismissal followed a bench trial, our review is de novo on the record with a presumption that the trial court's factual findings are correct, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W3d 291, 296 (Tenn. Ct. App. 2001). Our review of the trial court's conclusions of law is de novo with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

### A. Corporate Opportunity Doctrine

The corporate opportunity doctrine "is but specie of the command that fiduciaries act with undivided loyalty and is another manifestation of the requirement of utmost good faith." 18B Am. Jur. 2d *Corporations* § 1520, Westlaw (database updated Aug. 2019). It "is a key component of the duty of loyalty." Gabriel Rauterberg & Eric Talley, *Contracting Out of the Fiduciary Duty of Loyalty: An Empirical Analysis of Corporate*

---

[4] Chemical Properties did not appeal the dismissal of its tortious interference with business relations claim.

8

*Opportunity Waivers*, 117 COLUM. L. REV. 1075, 1086 (2017). For Chemical Properties, we look to the Tennessee Revised Limited Liability Company Act for "the core aspects of the fiduciary duty of loyalty."[5] Revised Unif. Ltd. Liab. Co. Act § 409 cmt. (Unif. Law Comm'n 2006) (referring to the Revised Uniform Limited Liability Company Act). Because Chemical Properties is a member-managed LLC, Gene and James owe a duty of loyalty to both the LLC and each other "[t]o account to the LLC and to hold as trustee for it any property, profit or benefit derived by the member in the conduct . . . of the LLC's business, or derived from a use by the member of the LLC's property, including the appropriation of any opportunity of the LLC." Tenn. Code Ann. § 48-249-403(b)(1) (2019).

Although the duty of loyalty may not be waived, the operating agreement may "[i]dentify specific types or categories of activities that do not violate [certain aspects of] the duty of loyalty . . . , if not manifestly unreasonable." *Id.* § 48-249-205(b)(13)(A). Both before the chancery court and now on appeal, Gene argues that the operating agreement for Chemical Properties did just that, obviating the need to consider whether the opportunity to purchase the Cockrill Bend Warehouse was a corporate opportunity. Even as chief manager of Chemical Properties, the operating agreement authorized Gene to "engage in whatever other activities he so chooses, whether or not such activities compete with the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Member." Based on that language, Gene submits that he could "look for opportunities to purchase commercial real estate and lease it to others," including to NCE.

We, like the chancery court, are unpersuaded by the argument. While an operating agreement may eliminate a member's duty to refrain from competing with the LLC, the duty not to appropriate opportunities of the LLC may only be limited or refined by reference to "specific types or categories of activities" and, even then, "if not manifestly unreasonable." *Id.* §§ 48-249-205(b)(13), -403(b). Chemical Properties' operating agreement does not reference specific types or categories of activities that would be permissible. To the extent Gene argues that the waiver extended to "business ventures of every nature and description" such a blanket waiver would not comply with the Act. Waiver of fiduciary duties must be clear and specific. *See Kelly v. Blum*, No. CIV.A. 4516-VCP, 2010 WL 629850, at *10 n.70 (Del. Ch. Feb. 24, 2010) (applying Delaware's Limited Liability Company Act).

---

[5] Although it was formed prior to January 1, 2006, Chemical Properties elected to be governed by the Tennessee Revised Limited Liability Company Act. *See* Tenn. Code Ann. § 48-249-1002(b) (2019). Although named the Tennessee Revised Limited Liability Company Act, "many provisions of . . . [the Tennessee] Act are drawn largely from the [Uniform Limited Liability Company Act] or the Delaware LLC Act." Eric Reagan, *Tennessee's New Limited Liability Company Act: New Ways of Doing Business*, 73 TENN. L. REV. 267, 274 (2006).

1. Tests for Determining Whether an Opportunity is Corporate

Having rejected the argument that the operating agreement barred the corporate opportunity claims, we consider the question of whether the opportunity to purchase the Cockrill Bend Warehouse was a corporate opportunity. In making its evaluation, the chancery court looked to cases of this Court as well as the courts of other jurisdictions. But "[v]arious courts have embraced different versions of the corporate opportunity doctrine." *Ne. Harbor Golf Club, Inc. v. Harris*, 661 A.2d 1146, 1149 (Me. 1995); *see also* Matthew R. Salzwedel, *A Contractual Theory of Corporate Opportunity and A Proposed Statute*, 23 PACE L. REV. 83, 97 (2002) (There are "four primary tests courts use to determine whether an opportunity is a 'corporate opportunity.'"). The corporate opportunity doctrine tests include the "traditional" or "line of business" test, the "fairness test," the Minnesota or Miller "two-step" approach, and the American Law Institute or ALI approach. Salzwedel, *supra*, at 98-99, 102, 105; *Ne. Harbor Golf Club, Inc.*, 661 A.2d at 1149-50.

The traditional or line of business test, which we discuss further below, comes from the decision of the Delaware Supreme Court in *Guth v. Loft*, 5 A.2d 503 (Del. 1939). Salzwedel, *supra*, at 98-99; *Ne. Harbor Golf Club, Inc.*, 661 A.2d at 1149. The fairness test focuses on the unfairness of a fiduciary taking for his personal benefit an opportunity "'when the interest of the corporation justly call[s] for protection.'" *Durfee v. Durfee & Canning*, 80 N.E.2d 522, 529 (Mass. 1948) (quoting Henry Winthrop Ballatine, BALLATINE ON CORPORATIONS 204-05 (Rev. Ed. 1946)). The test "'calls for application of ethical standards of what is fair and equitable . . . [in] particular sets of facts.'" *Id.* (quoting Ballatine, *supra* at 204-05).

The two-step approach, adopted by the Minnesota Supreme Court in *Miller v. Miller*, 222 N.W.2d 71 (Minn. 1974), combines the line of business and fairness tests. *Ne. Harbor Golf Club, Inc.*, 661 A.2d at 1150. The American Law Institute approach, as the name implies, is a statement of the doctrine of corporate opportunity applicable to directors or senior executives and controlling shareholders adopted by the American Law Institute. *See* Principles of Corp. Governance §§ 5.05, 5.12 (1994). The ALI defines a corporate opportunity differently depending on the role of the party seeking to exploit the opportunity. *Compare id.* § 5.05 (b)(1) (defining corporate opportunities of which a director or senior executive becomes aware), *and id.* § 5.05(b)(2) (defining corporate opportunities of which a senior executive becomes aware), *with id.* § 5.12(b) (defining corporate opportunities for controlling shareholders). Another distinguishing feature of the ALI approach is the requirement that an opportunity be presented to and rejected by the corporation in some instances. *See* Harvey Gelb, *The Corporate Opportunity Doctrine-Recent Cases and the Elusive Goal of Clarity*, 31 U. RICH. L. REV. 371, 409 (1997) ("When a corporate opportunity exists under the ALI approach, a director or senior executive must first offer it to the corporation.").

10

This Court has utilized both the line of business test and the ALI approach. *Compare Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 604-05 (Tenn. Ct. App. 1998) (indirectly quoting the rule in *Guth*), *and Schwegman v. Howard*, No. M2001-00845-COA-R3-CV, 2002 WL 31247084, at *5 (Tenn. Ct. App. Oct. 8, 2002) (same), *with Tenn. Bearing & Supply, Inc. v. Parrish*, No. 88-118-II, 1988 WL 122337, at *2 (Tenn. Ct. App. Nov. 16, 1988) (following the Supreme Court of Oregon, in adopting the definition of a corporate opportunity from the ALI's Tentative Draft No. 3 concerning Principles of Corporate Governance: Analysis and Recommendations). And the chancery court and the parties have tried to harmonize the two differing versions of the corporate opportunity doctrine. But we conclude Delaware's line of business test should apply. The Delaware LLC Act significantly influenced the Tennessee Revised Limited Liability Company Act. Eric Reagan, *Tennessee's New Limited Liability Company Act: New Ways of Doing Business*, 73 TENN. L. REV. 267, 274 (2006). And, as we have previously stated, "in matters of corporate law, Tennessee courts look to Delaware law." *Rock Ivy Holding, LLC v. RC Props., LLC*, 464 S.W.3d 623, 635 (Tenn. Ct. App. 2014).

2. Application of the Delaware Test

In *Guth v. Loft, Inc.*, the Delaware Supreme Court described the doctrine of corporate opportunity as follows:

> if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

5 A.2d 503, 511 (Del. 1939). From *Guth* and later cases, the court has developed a four factor test or rule for analyzing the corporate opportunity doctrine. Under Delaware law,

> a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). Delaware also recognizes a four factor corollary:

11

[A] director or officer may take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity.

*Id.* (citing *Guth*, 5 A.2d at 509). Under either the *Guth* rule or its corollary "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.* The determination of whether a particular fiduciary has usurped a corporate opportunity is a factual question, "necessitat[ing] a careful examination of the circumstances." *Id.*

Here, in determining that no corporate opportunity existed, the chancery court examined some of the applicable *Guth* factors. It found that Chemical Properties was financially able to exploit the opportunity to purchase the Cockrill Bend Warehouse and that the opportunity was within Chemical Properties' line of business. But it determined that James and Chemical Properties failed to prove that Chemical Properties had an interest or expectancy in the opportunity. As part of the interest or expectancy analysis, the court also considered whether the opportunity to purchase the Cockrill Bend Warehouse was presented to Gene in his individual or official capacity. As might be expected, James and Chemical Properties fault the court's analysis of the interest or expectancy factor.

As an initial matter, we conclude the court did not err in considering whether the opportunity was presented to Gene in his individual or official capacity. The burden imposed on the fiduciary "to show adherence to his fiduciary duties . . . [is] lessened to some extent" when the opportunity is presented in his individual capacity. *Id.* Given the *Guth* corollary, the capacity might even be considered first. *See Rapistan Corp. v. Michaels*, 511 N.W.2d 918, 924 (Mich. Ct. App. 1994) (citing *Guth*, 5 A.2d at 511) ("[T]he nature of the opportunity is analyzed differently, depending on whether the opportunity is presented to a corporate official in the official's individual or corporate representative capacity."). The burden falls on the fiduciary to "satisfactorily . . . prove that the offer was made to him individually." *Guth*, 5 A.2d at 512. But once it is shown that an offer was presented in the fiduciary's individual capacity, the party attacking the transaction has a heavier burden. Ronald J. Colombo, LAW OF CORP. OFFS. & DIRS.: RTS., DUTIES & LIABS. § 4:9, Westlaw (database updated Oct. 2019).

The court found the opportunity to purchase the Cockrill Bend Warehouse was presented to Gene in his individual capacity. And the evidence does not preponderate against that finding. Mr. Hayes had no knowledge of Chemical Properties. And none of the individuals inquiring of him about the Cockrill Bend Warehouse identified themselves as representing Chemical Properties. Of the two members/managers of

12

Chemical Properties, only Gene had any interaction with Mr. Hayes, and Mr. Hayes only knew him as a member of his country club and as a representative of NCE. When asked why he placed Gene first in line to buy the property, Mr. Hayes answered that "it seemed like a perfect fit," Gene "was right up the street, he had the need, he seemed, you know, like a really honest individual and I felt like he would close on it," and he "just had a really good feeling about Gene, frankly."

Having determined the opportunity was presented to the fiduciary in his individual capacity, applying the *Guth* corollary, we consider whether the opportunity was essential to Chemical Properties, whether Chemical Properties held an interest or expectancy in the opportunity, and whether Gene wrongfully employed the resources of Chemical Properties in pursuing or exploiting the opportunity. *See Broz*, 673 A.2d at 155. The chancery court made no findings regarding whether the opportunity was essential to Chemical Properties. Here, we can "conduct[] a de novo review of the record to determine where the preponderance of the evidence lies." *Lovlace v. Copley*, 418 S.W.3d 1, 36 (Tenn. 2013). In his testimony, James called Chemical Properties "a great investment" and a "cash cow." He said the LLC "was debt-free" and that its "financial situation was very favorable, very strong." All the evidence lies in favor of a finding that the opportunity was not essential to Chemical Properties. The acquisition of the Cockrill Bend Warehouse would have only made Chemical Properties a larger and more productive cow.

The court considered the second factor, finding that Chemical Properties held no interest or expectancy in the opportunity. As the Delaware Supreme Court has explained, "to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business." *Johnston v. Greene*, 121 A.2d 919, 924 (Del. 1956). James and Chemical Properties argue that, "[u]ndoubtedly, there is a 'tie to the nature of the corporate business' between the Cockrill Bend [Warehouse] and Chemical Properties." But the proof established that Chemical Properties never searched for additional commercial properties to acquire prior to James putting on his metaphorical "Chemical Properties hat" following his January 2015 meeting with Mr. Reardon. James knew that Gene was looking for property for NCE as early as 2013 but did not make any suggestion that the acquisition should be handled through Chemical Properties until Gene already had an option to purchase property. *Cf. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 973 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) ("[P]laintiff does not allege any facts that would imply that [the corporation] was in need of additional capital, seeking additional capital, or even remotely interested in finding new investors."). We also find it significant that Gene, as a co-owner of Chemical Properties, was opposed to expanding the LLC's holdings. Gene had no obligation to agree to future acquisitions of property or to future lease commitments by Chemical Properties. In sum, the evidence does not preponderate against the finding that Chemical Properties had no interest, actual or in expectancy, in purchasing the Cockrill Bend Warehouse.

13

The chancery court also made a finding concerning the final factor, whether the fiduciary wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity. Again, we can conduct a de novo review of the record to determine where the preponderance of the evidence lies. No allegation was made that Gene used any resources of Chemical Properties beyond James's claim that he presented to Gene on behalf of the LLC an opportunity to purchase the Cockrill Bend Warehouse. We find such a claim unsupported by the evidence. Even if James was acting on behalf of Chemical Properties as he claims, the proof showed that he did not bring an opportunity to purchase the Cockrill Bend Warehouse to Gene. Additionally, we note that Gene did not seek out James or his assistance in the search for properties, and Gene used his personal wealth to acquire the Cockrill Bend Warehouse.

All the factors of the *Guth* corollary support the chancery court's determination that the opportunity to acquire the Cockrill Bend Warehouse was not an opportunity belonging to Chemical Properties. Because the breach of fiduciary duty claims of James and Chemical Properties were founded on the contention that the opportunity belonged to the LLC, the court properly dismissed those claims.

B. UNJUST ENRICHMENT

James also appeals the dismissal of his claim against Gene for unjust enrichment. Unjust enrichment is a quasi-contract theory under which a court may imply a contractual obligation between parties "where one does not exist." *Metro. Gov't of Nashville & Davidson Cty. v. Cigna Healthcare of Tenn., Inc.*, 195 S.W.3d 28, 32 (Tenn. Ct. App. 2005). "Contracts implied in law or quasi contracts are created by law without the parties' assent and are based upon reason and justice." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524 (Tenn. 2005). We imply "a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998).

A successful unjust enrichment claim requires proof of three elements: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware of the benefit; and (3) the defendant accepted the benefit "under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC*, 172 S.W.3d at 525 (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966)). The most important element is "that the benefit to the defendant be unjust." *Id.* "The party seeking to recover using an unjust enrichment theory has the burden of proving it is entitled to relief." *D.T. McCall & Sons v. Seagraves*, 796 S.W.2d 457, 464 (Tenn. Ct. App. 1990) (citing *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986)). "Whether or not a benefit was conferred on the defendants by the plaintiffs

14

is a fact question." *CK Supply v. Scrivner, Inc.*, No. C.A. 888, 1989 WL 157312, at *2 (Tenn. Ct. App. Dec. 8, 1989); *Simpson v. Bicentennial Volunteers, Inc.*, No. 01A01-9809-CV-00493, 1999 WL 430497, at *2 (Tenn. Ct. App. June 29, 1999).

The chancery court gave two reasons for its dismissal of James's claim. First, the court determined that a quasi-contract theory would not apply because there was a valid and enforceable contract between the parties, namely the operating agreement of Chemical Properties. Second, even if the theory applied, the court found that James had failed to prove that he had conferred a benefit on Gene. We agree with James that the existence of the operating agreement did not bar recovery under an unjust enrichment theory. The operating agreement permitted the members to compete with the LLC and excused them from any obligation to offer an interest in any activity to the other or the LLC. But the operating agreement does not address or cover what James alleges occurred here, a member offering an opportunity to the LLC. So we focus our review on whether the evidence supports a finding that James conferred a benefit on Gene.

The complaint alleged that James "provid[ed] [Gene] with knowledge concerning the availability of the Cockrill Bend [Warehouse]." On appeal, James claims that he conferred the "benefit of the Cockrill Bend transaction" on Gene. For unjust-enrichment purposes, a person might confer a benefit upon another person

> if he or she gives to the other possession of or some other interest in money, land, chattels, or choses in action; performs services beneficial to or at the request of the other; satisfies a debt or a duty of the other; or in any way adds to the other's security or advantage; he or she confers a benefit not only where he or she adds to the property of another but also where he or she saves the other from expense or loss; in other words, "benefit" denotes any form of advantage.

66 AM. JUR. 2D *Restitution and Implied Contracts* § 16, Westlaw (database updated Aug. 2019) (footnotes omitted).

On this record, we can find no advantage James conferred on Gene. We note that his first contact regarding the Cockrill Bend Warehouse was with Mr. Allison, not with Gene. But even if we assume that he contacted Mr. Allison with the intention that his information be forwarded to his brother, the only information he provided was publically available or not advantageous. He provided an advertising flyer indicating the property was available for lease and information that the owner of the property was interested in an outright sale. By the time he provided his "information," the property was already under contract for sale to another party.

James did not facilitate the purchase of the Cockrill Bend Warehouse. Mr. Hayes's testimony made no mention of James. And James did not factor into the

reasoning Mr. Hayes gave for putting Gene "first in line" to purchase the Cockrill Bend Property. In some respects, James's involvement worked against Gene. James involved Mr. Gorney, who became a competing bidder for the property. Under the circumstances, the evidence preponderates in favor of a finding that James conferred no benefit on Gene.

## III.

Gene Mulloy did not breach his fiduciary duties to either James Malloy or Chemical Properties, LLC by usurping a corporate opportunity. The evidence did not support a finding that the opportunity to acquire the Cockrill Bend Warehouse was a corporate opportunity. The evidence also did not support a finding that James Malloy conferred a benefit on his brother, Gene Malloy, in connection with his purchase of the Cockrill Bend Warehouse. In light of the proof, we affirm the judgment dismissal of the corporate opportunity and unjust enrichment claims. We remand the case to the chancery court for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE